# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | | |
|---|---|---|
| CHRISTOPHER DOYLE, LPC, LCPC, individually and on behalf of his clients, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. <u>1:19-cv-190</u> |
| v. | ) ) | **INJUNCTIVE RELIEF SOUGHT** |
| LAWRENCE J. HOGAN, JR., Governor of the State of Maryland, in his official capacity, and BRIAN E. FROSH, Attorney General of the State of Maryland, in his official capacity, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION, REQUEST FOR HEARING, <u>AND MEMORANDUM OF LAW IN SUPPORT</u>

John R. Garza (D. Md. 01921)
GARZA LAW FIRM, P.A.
Garza Building
17 W. Jefferson Street, Suite 100
Rockville, Maryland 20850
301-340-8200 ext. 100
301-761-4309 FAX
jgarza@garzanet.com

Mathew D. Staver (Fla. 701092)[†]
Horatio G. Mihet (Fla. 26581)[†]
Roger K. Gannam (Fla. 240450)[†]
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854-0774
407-875-1776
407-875-0770 FAX
court@LC.org
hmihet@LC.org
rgannam@LC.org

*Attorneys for Plaintiffs*
[†]Application to appear *pro hac vice* forthcoming

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ iii

MOTION FOR PRELIMINARY INJUNCTION.............................................................1

REQUEST FOR HEARING.............................................................................................1

MEMORANDUM OF LAW ............................................................................................1

    STATEMENT OF FACTS ........................................................................................2

        A.     Plaintiff and His Voluntary Talk Therapy Practice for Minors with Sexual and Gender Identity Conflicts. ...........................................................2

        B.     SB 1028 Is Not Supported by the Sources It Cites or Any Legitimate Evidence of Harm. ...........................................................................6

                1.     The Sources Cited by SB 1028 Contain No Empirical Evidence of Harm. ........................................................................6

                2.     The APA Report Discloses Anecdotal Evidence of Benefits from SOCE at Least Equivalent to Anecdotal Evidence of Harm, and More Benefits Perceived by Religious Individuals. ............................7

                3.     The APA Report Excludes Gender Identity Change Efforts, Which Similarly Lack Empirical Research. ......................................................9

                4.     The APA Report Commends a Client-Directed Approach to Therapy for Clients with Unwanted Same-Sex Attractions, Commends More Research on Voluntary SOCE, and Condemns Only Coercive Therapies. .................................................................12

                5.     The APA Report Specifically Calls for Therapists to Respect and Consider the Religious Values of Individuals Desiring Therapy. .......17

    ARGUMENT....................................................................................................17

    I.     PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF HIS FIRST AMENDMENT CHALLENGE TO SB 1028. .........................................................18

        A.     Though Plaintiff Must Show the Preliminary Injunction Prerequisites, Defendants Have the Burden of Proving the Constitutionality of SB 1028 Under the First Amendment...........................................................................18

        B.     SB 1028 Restricts Plaintiff's Protected Speech. ..............................................19

C.      SB 1028 Unconstitutionally Discriminates Against Plaintiff's Protected Speech on the Basis of Viewpoint. ..................................................................20

D.      SB 1028 Unconstitutionally Discriminates Against Plaintiff's Protected Speech on the Basis of Content. ....................................................................23

      1.      SB 1028 Is a Content-Based Restriction on Speech Which is Presumptively Invalid and Subject to Strict Scrutiny. .........................23

      2.      Defendants Have the Burden of Proof on Strict Scrutiny...................25

           a.      Defendants Must Show Empirical or Concrete Evidence of Harm. ...................................................................................25

           b.      Defendants Must Show That SB 1028 Was the Least Restrictive Means Available at the Time of Enactment. .........27

      3.      There Is No Compelling or Other Sufficient Governmental Interest for SB 1028's Ban on Voluntary Talk Therapy...................................28

      4.      SB 1028 Is Not the Least Restrictive Means or Otherwise Narrowly Tailored. ....................................................................................29

E.      SB 1028 Is an Unconstitutional Prior Restraint. ..............................................31

F.      SB 1028 Is Unconstitutionally Vague. ..............................................................32

II.     PLAINTIFF WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF PRELIMINARY RELIEF. ............................................................................................33

III.    THE BALANCE OF EQUITIES FAVORS PLAINTIFF. .........................................34

IV.     INJUNCTIVE RELIEF SERVES THE PUBLIC INTEREST. ..................................35

CONCLUSION ....................................................................................................................35

# TABLE OF AUTHORITIES

**CASES**

*11126 Baltimore Blvd., Inc. v. Prince George's Cnty., Md.*, 58 F.3d 988 (4th Cir. 1995)............32

*ACLU of Ill. v. Alvarez,* 679 F.3d 583 (7th Cir. 2012)...................................................35

*Ashcroft v. ACLU*, 542 U.S. 656 (2004) ...........................................................18,19,27

*Awad v. Ziriax*, 670 F.3d 1111 (10th Cir. 2012)......................................................33

*Bantham Books, Inc. v. Sullivan*, 372 U.S. 58 (1963)..................................................31

*Boos v. Berry*, 485 U.S. 312 (1988).....................................................................27

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) ...........................................................32

*Brown v. Entertainment Merchants Assn.*, 564 U.S. 786 (2011).....................................31

*Bruni v. City of Pittsburgh*, 824 F.3d 353 (3d Cir. 2016) ............................................28

*Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184 (4th Cir. 2013) ......................17,18

*City of Littleton v. Z.J. Gifts D-4, L.L.C.*, 541 U.S. 774 (2004) ..................................32

*Columbia Union Coll. v. Clarke,* 159 F.3d 151 (4th Cir. 1998) .............................20,21

*Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002) ...............................................22,23

*Connally v. Gen. Const. Co.*, 269 U.S. 385 (1926)....................................................32

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788 (1985)...............................20

*Edenfield v. Fane*, 507 U.S. 761 (1993) ...............................................................26

*Elrod v. Burns*, 427 U.S. 347 (1976) ..............................................................33,35

*Florida Bar v. Went For It, Inc.*, 515 U.S. 618 (1995) ............................................22

*Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123 (1992)......................................31

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006) .............18,19

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)....................................................32

*Holder v. Humanitarian Law Project,* 561 U.S. 1 (2010) ............................................19

*Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*, 138 S. Ct. 2448 (2018) .........25,26

*King v. Governor of New Jersey,* 767 F.3d 216 (3d Cir. 2014) ....................................20

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993) ............................20

*Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829 (1978) ........................................26

*Legal Servs. Corp. v. Velazquez*, 531 U.S. 533 (2001) ..........................................19,22

*Legend Night Club v. Miller*, 637 F.3d 291 (4th Cir. 2011) ....................................33,34

*Machesky v. Bizzell*, 414 F.2d 283 (5th Cir. 1969) .......................................35

*Mason v. Florida Bar*, 208 F.3d 952 (11th Cir. 2000).....................................27

*McCullen v. Coakley*, 134 S. Ct. 2518 (2014) ........................................27,28

*NAACP v. Button*, 371 U.S. 415 (1963)...........................................19,25,32

*Nat'l Inst. for Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371–72 (2018) [*NIFLA*]........................................................19,20,22,24,31

*Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.,* 354 F.3d 249 (4th Cir. 2003) ..............33,34

*Pickup v. Brown,* 740 F.3d 1208 (9th Cir. 2014) ......................................20

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) .....................................23,24,30

*Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015)..........................................19,23,24,25

*Reynolds v. Middleton*, 779 F.3d 222 (4th Cir. 2015)..................................28

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995).....................................20

*Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115 (1989) ..............................26,27,30

*Schneider v. New Jersey*, 308 U.S. 147 (1939)..........................................34

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105 (1991).........25

*Sorrell v. IMS Health*, 564 U.S. 552 (2011) ......................................20,22,29,30

*Texans for Free Enter. v. Texas Ethics Comm'n*, 732 F.3d 535 (5th Cir. 2013) ..........................35

*Time, Inc. v. Hill*, 385 U.S. 374 (1967).......................................35

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994).....................................26

*United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803 (2000) ................................18

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982)..................32,33

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ...................................................................27

*Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7 (2008).......................................18

*Wollschlaeger v. Florida*, 848 F.3d 1293 (11th Cir. 2017) ...........................................20,28,29,30

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. I .................................................................................................... *passim*

## STATUTES AND REGULATIONS

Md. Code Regs. 10.58.03.05...........................................................................................29

Md. Senate Bill 1028 (2018) [SB 1028] ......................................................................... *passim*

## RULES

D. Md. L.R. 105.6 ...........................................................................................................1

Rule 65, Fed. R. Civ. P. ..................................................................................................1

## OTHER AUTHORITIES

11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane*, Federal Practice & Procedure* §2948.1 (2d ed. 1995) .........................................................................33,34

Am. Psychol. Ass'n, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70(9) Am. Psychologist 832 (2015) [APA TGNC Guidelines], https://www.apa.org/practice/guidelines/transgender.pdf ...................................10,11

Am. Psychol. Ass'n Task Force on Appropriate Therapeutic Responses to Sexual Orientation, *Report of the Task Force on Appropriate Therapeutic Responses to Sexual Orientation* (2009) [APA Report], https://www.apa.org/pi/lgbt/resources/therapeutic-response.pdf ...................................................................................................... *passim*

Heino F. L. Meyer-Bahlburg, *Gender Identity Disorder in Young Boys: A Parent- and Peer-Based Treatment Protocol*, 7 Clinical Psychol. and Psychiatry 360, 361 (2002) [Meyer-Bahlburg] ......................................................................................................11

Stewart L. Adelson, M.D., The American Academy of Child and Adolescent Psychiatry (AACAP) Committee on Quality Issues, *Practice Parameter on Gay, Lesbian, or Bisexual Sexual Orientation, Gender Nonconformity, and Gender Discordance in Children and Adolescents*, 51(9) J. Am. Acad. Child & Adolescent Psychiatry 957, 968 (2012) [AACAP Statement], *available at* https://doi.org/10.1016/j.jaac.2012.07.004 ........................................................................................................................9,10,11

## MOTION FOR PRELIMINARY INJUNCTION

Plaintiff, CHRISTOPHER DOYLE, LPC, LCPC, individually and on behalf of his clients, pursuant to Rule 65, Fed. R. Civ. P., moves the Court for a preliminary injunction enjoining Defendants, together with their officers, agents, servants, employees, and others who are in active concert or participation with them, from enforcing SB 1028 on the grounds that it violates the First Amendment and the Constitution of Maryland, as set forth more fully in the following memorandum of law, the Declaration of Christopher Doyle in Support of Plaintiff's Motion for Preliminary Injunction ("Doyle Declaration") attached hereto as <u>Exhibit A</u>, and the Verified Complaint for Declaratory Relief, Preliminary and Permanent Injunctive Relief, and Damages filed contemporaneously with this motion.

## REQUEST FOR HEARING

Pursuant to Local Rule 105.6, Plaintiff requests that his motion for preliminary injunction be set for a hearing at the Court's earliest opportunity. Given the weighty First Amendment issues involved, and the ongoing and irreparable injury being visited on Plaintiff and his clients each day Maryland's counseling ban law remains in effect, Plaintiff believes that oral argument would assist the Court in understanding and deciding the issues presented.

## MEMORANDUM OF LAW

**"There is a lack of published research on SOCE among children."**

**"We found no empirical research on adolescents who request SOCE . . . ."**

**"The debate surrounding SOCE has become mired in ideological disputes and competing political agendas."**

**—APA Report[1]**

---

[1]     V. Compl. Ex. B, APA Rpt., at 72, 73, 92; *see id.* at 2 n.** (defining "sexual orientation change efforts (SOCE)" to encompass practices prohibited by SB 1028 as "conversion therapy"); *see infra* Stmt. Facts Part B.

By enacting SB 1028, Maryland is storming the office doors of therapists, thrusting the State into the sacrosanct relationship of counselor and client, and running roughshod over clients' and counselors' cherished First Amendment liberties. Maryland's justification for such unconscionable actions is that it does not approve of voluntary, professional counseling that affirms and assists a minor's desire to reduce or eliminate unwanted same-sex attractions or gender identity conflicts. Maryland offers no actual evidence of harm arising from such voluntary treatment, but instead relies on position papers by advocacy groups that either disregard or misrepresent the empirical record. SB 1028 is in gross violation of the United States and Maryland constitutions and should be enjoined.

## STATEMENT OF FACTS

Plaintiff refers to the sworn facts set forth in the Verified Complaint and Doyle Declaration filed contemporaneously with this motion and incorporates those facts herein as if set forth in full.[2] Without limitation, Plaintiff particularly emphasizes the following facts.

### A. Plaintiff and His Voluntary Talk Therapy Practice for Minors with Sexual and Gender Identity Conflicts.

Plaintiff Christopher Doyle is a therapist licensed by the State of Maryland. (V. Compl. ¶ 13). Plaintiff has devoted most of his professional life to providing counseling to young people and their parents who are seeking help for unwanted same-sex attractions. (V. Compl. ¶ 101; Doyle Decl. ¶¶ 3–7.) In his practice, Plaintiff helps clients with their unwanted same-sex attractions, behaviors, and identity by talking with them about root causes, about gender roles and identities, and about their distress and confusion that arise from these attractions. (V. Compl. ¶ 111; Doyle Decl. ¶¶ 9–15.) Speech is the primary tool that Plaintiff uses in his counseling with minors who

---

[2]     Unless otherwise indicated, capitalized terms herein have the same meanings as in the Verified Complaint and Doyle Declaration.

state that their therapeutic goal is to seek to reduce or eliminate their unwanted same-sex attractions, behaviors, or identity. (V. Compl. ¶ 112; Doyle Decl. ¶¶ 9–15.) Plaintiff does not begin counseling with any predetermined goals other than those that the clients themselves identify and set. (V. Compl. ¶ 115; Doyle Decl. ¶¶ 9–15.) This is consistent with his clients' fundamental right of self-determination. (*Id.*)

If a client determines that he or she wants help to reduce or eliminate unwanted same-sex attractions, behaviors, or desires, or gender identity conflicts, then prior to engaging in counseling Plaintiff provides the client with an informed consent form and requires the client to review and sign it prior to commencing counseling. (V. Compl. ¶ 108.) This informed consent form outlines the nature of counseling (which Plaintiff identifies as "Sexual/Gender Identity Affirming Therapy"), explains the controversial nature of such counseling, including the fact that some therapists do not believe sexual orientation or gender identity can or should be changed, and informs the client of the potential benefits and risks associated with counseling to eliminate, reduce, or resolve unwanted same-sex attractions, behaviors, or identity. (V. Compl. ¶ 108.) In Plaintiff's informed consent form, he quotes research both from the 2009 APA Report and from the 2009 research overview of the National Association for Research and Therapy of Homosexuality (NARTH), titled "What Research Shows," which summarizes decades of research on the efficacy of counseling to eliminate, reduce, or resolve unwanted same-sex attractions, behaviors, or identity. (V. Compl. ¶ 108.)

Plaintiff employs speech and standard psychological instruments and practices to help clients understand and identify their anxiety or confusion regarding their attractions, behaviors, or identity and then to help each client formulate the method of counseling that will most benefit that particular client. (V. Compl. ¶ 113; Doyle Decl. ¶¶ 9–15.) Plaintiff often finds that a client is not

ready or does not desire immediately to begin seeking to reduce or eliminate their unwanted same-sex attraction, behaviors, or identity. (V. Compl. ¶ 114.) When that is the case, Plaintiff focuses on helping the client and parents to heal any wounds or frustrations and to begin working on loving and accepting the minor client, despite any challenges that arise from the unwanted same-sex attractions, behaviors, or identity. (*Id.*)

Contrary to the presumption of SB 1028, Plaintiff's counseling is not premised on the notion that homosexuality is an illness, defect, or shortcoming. (V. Compl. ¶ 118.) Plaintiff has never publicly stated that he believes homosexuality or same-sex attractions is a mental illness in need of a "cure." (V. Compl. ¶ 118.) Plaintiff does not seek to "cure" clients of same-sex attractions, but only to assist clients with their stated desires and objectives in counseling, which sometimes include reducing or eliminating unwanted same-sex attractions. (V. Compl. ¶ 119.) In most cases, clients do not even identify as "homosexual" or "gay" or "lesbian," but rather believe they are heterosexual and experiencing conflicts with their heterosexual identities due to traumatic or other experiences that have caused unwanted same-sex attractions or behaviors. (V. Compl. ¶ 68.) The only relevant consideration in Plaintiff's counseling, and in all mental health counseling, is that same-sex attractions or behaviors are at variance with the client's self-described heterosexual identity, causing anxiety or distress, and that the client seeks to eliminate the attractions or behaviors that lead to such anxiety or distress. (V. Compl. ¶ 121.)

Plaintiff has five minor clients he is counseling with unwanted same-sex attractions and/or gender identity conflicts, and roughly a dozen families with minor children who are consulting with him regarding their children's unwanted same-sex attractions and/or gender identity conflicts, who have been seeing improvement and progress toward their therapeutic goals. (V. Compl. ¶ 105.) These minor clients will suffer significant mental health consequences if they are required

to halt their counseling to eliminate, reduce, or resolve unwanted same-sex attractions, behaviors, or identity because of SB 1028, potentially including anxiety, depression, and suicidal ideation. (V. Compl. ¶ 106.)

The voluntary talk therapy Plaintiff practices to help his clients achieve their goals of reducing or eliminating unwanted same-sex attractions, behaviors, or identities, or gender identity conflicts, is now prohibited by SB 1028. (V. Compl. ¶ 124; Doyle Decl. ¶¶ 15, 18, 19.) The counseling ban statute prohibits licensed professionals such as Plaintiff from engaging in such voluntary counseling under threat of fines and disciplinary action. (V. Compl., Ex. A, SB 1028 at 5–6.) SB 1028 carves out individualized exceptions for counseling that affirms and commends minors' development of changing attractions, behaviors, or identity towards homosexuality or a cross-gender identity, thereby punishing only the viewpoint that such attractions, behaviors, or identity can be reduced, resolved, or eliminated—if the client desires—towards a heterosexual or biological gender identity. (V. Compl. Ex. A, SB 1028, at 5.)

The statute purports to be aimed at protecting minors from harm caused by Plaintiff's counseling, but recites no legitimate evidence of harm from such counseling which is voluntarily sought, given, and received. (V. Compl. ¶¶ 23–41; Doyle Decl. ¶¶ 15–17.) SB 1028 will prevent Plaintiff's clients from continuing to progress in their self- and individually-determined courses of counseling, and from continuing to receive counseling in accordance with their sincerely held religious beliefs. (V. Compl. ¶¶ 106, 107, 138–141; Doyle Decl. ¶¶ 16, 18, 21.) In addition, SB 1028 will adversely affect the ability of Plaintiff and other Maryland professionals to counsel future clients who have requested or will request counseling for unwanted same-sex attractions, behaviors, or identity, or gender identity conflicts, because the counseling ban will require Plaintiff

and other professionals to stop providing or decline to provide such voluntary counseling. (V. Compl. ¶¶ 134–35.)

**B.    SB 1028 Is Not Supported by the Sources It Cites or Any Legitimate Evidence of Harm.**

**1.    The Sources Cited by SB 1028 Contain No Empirical Evidence of Harm.**

The sources cited in the Preamble of SB 1028 (collectively, the "Sources") comprise the 2009 APA Report, the accompanying APA Resolution, and twelve position documents of various organizations that neither supplement, update, or otherwise augment the APA Report. (V. Compl. Ex. A, SB 1028, at 1–4; V. Compl. ¶ 23 & Ex. B.)

The APA Report does not use the political term "conversion therapy" like SB 1028. Rather, the APA Report uses "the term sexual orientation change efforts (SOCE) to describe methods (e.g., behavioral techniques, psychoanalytic techniques, medical approaches, religious and spiritual approaches) that aim to change a person's same-sex sexual orientation to other-sex, regardless of whether mental health professionals or lay individuals (including religious professionals, religious leaders, social groups, and other lay networks, such as self-help groups) are involved." (V. Compl. Ex. A, APA Rep., at 2 n.**.)

The APA Report discloses up front, and repeatedly throughout, that there is no empirical or other research supporting **any conclusions** regarding either efficacy **or harm** from SOCE, especially in children and adolescents. (V. Compl. Ex. A, APA Rep., at 3 ("[T]he recent SOCE research **cannot provide conclusions** regarding efficacy or safety . . . ."), 7 ("The research on SOCE **has not adequately assessed** efficacy and safety."), 37 ("These [recent] studies all use designs that **do not permit cause-and-effect attributions to be made**."), 42 ("[T]he recent studies **do not provide valid causal evidence** of the efficacy of SOCE **or of its harm** . . . ."), 42 ("[T]he nature of these studies **precludes causal attributions** for harm or benefit to SOCE . . . ."), 42

("We conclude that there is a **dearth of scientifically sound research** on the safety of SOCE. . . . Thus, **we cannot conclude how likely it is that harm will occur** from SOCE."), 72 ("**There is a lack of published research on SOCE among children**."), 73 ("**We found no empirical research on adolescents who request SOCE . . . .**"), 91 ("**We concluded that research on SOCE . . . has not answered basic questions of whether it is safe or effective and for whom**."), 91 ("**[S]exual orientation issues in children are virtually unexamined**.") (all emphases added).) None of the other Sources adds anything to the empirical record unequivocally found to be lacking in the APA Report.[3]

> ## 2. The APA Report Discloses Anecdotal Evidence of Benefits from SOCE at Least Equivalent to Anecdotal Evidence of Harm, and More Benefits Perceived by Religious Individuals.

Given the lack of empirical research on the outcomes of SOCE, the task force preparing the APA Report looked to participants' perceptions of SOCE, "in order to examine what may be perceived as being helpful or detrimental by such individuals, distinct from a scientific evaluation of the efficacy or harm . . . ." (V. Compl. Ex. A, APA Rep., at 49.) The review did not show evidence of one outcome over the other. "[S]ome recent studies document that there are people who perceive that they have been harmed through SOCE, just as other recent studies document that there are people who perceive that they have benefited from it." (V. Compl. Ex. A, APA Rep., at 42 (citations omitted).)

Nonetheless, the task force found several reported benefits of SOCE perceived by participants: "(a) a place to discuss their conflicts; (b) cognitive frameworks that **permitted them**

---

[3]    One of the Sources cited in the SB 1028 Preamble recites statistics of harm purportedly caused by "family rejection" but excludes any claim of a causal link, or even a correlation, with SOCE. (V. Compl. Ex. A, SB 1028, at 4 (citing "study published in 2009 in the journal 'Pediatrics'").)

**to reevaluate their sexual orientation identity, attractions, and selves in ways that lessened shame and distress and increased self-esteem**; (c) social support and role models; and (d) **strategies for living consistently with their religious faith and community**." (V. Compl. Ex. A, APA Rep., at 49 (emphasis added) (citations omitted).) "Participants described the social support aspects of SOCE positively." (*Id.*)

The task force also observed that perceptions of harm may correlate specifically to "aversion techniques." (V. Compl. Ex. A, APA Rep., at 41 ("Early research on efforts to change sexual orientation focused heavily on interventions that include **aversion** techniques. Many of these Studies did not set out to investigate harm. Nonetheless, these studies provide some suggestion that harm can occur from **aversive** efforts to change sexual orientation." (emphasis added)).) To illustrate, the Report gives some examples of aversion treatments:

> Behavior therapists tried a variety of aversion treatments, such as inducing nausea, vomiting, or paralysis; providing electric shocks; or having the individual snap an elastic band around the wrist when the individual became aroused to same-sex erotic images or thoughts. Other examples of aversive behavioral treatments included . . . shame aversion . . . .

(V. Compl. Ex. A, APA Rep., at 22.)[4]

The task force also found that individuals' religious beliefs shape their experiences and outcomes:

> [P]eople whose motivation to change was strongly influenced by their Christian beliefs and convictions were **more likely to perceive themselves as having a heterosexual sexual orientation after their efforts.** [T]hose who were less religious were more likely to perceive themselves as having an LGB sexual orientation after the intervention. **Some . . . concluded that they had altered their sexual orientation, although they continued to have same-sex sexual attractions.**

---

[4]     One of the Sources cited in the SB 1028 Preamble addresses **only** aversion therapy. (V. Compl. Ex. A, SB 1028, at 2 (citing "a report in 1994" by The American Medical Association Council on Scientific Affairs).)

(V. Compl. Ex. A, APA Rep., at 50 (emphasis added) (citations omitted).) "The participants had multiple endpoints, including LGB identity, 'ex-gay' identity, no sexual orientation identity, and a unique self-identity." (*Id.*) **"Further, the findings suggest that some participants may have reconceptualized their *sexual orientation identity* as heterosexual . . . ."** (*Id.* at 50 (bold emphasis added).)

### 3. The APA Report Excludes Gender Identity Change Efforts, Which Similarly Lack Empirical Research.

The APA Report addressed only sexual orientation: "Due to our charge, we limited our review to sexual orientation and **did not address gender identity** . . . ." (V. Compl. Ex. A, APA Rep., at 9 (emphasis added).) Another Source cited by SB 1028, however, points to the same lack of empirical research on the outcomes of gender identity change efforts:

> Different clinical approaches have been advocated for childhood gender discordance. **Proposed goals of treatment include reducing the desire to be the other sex**, decreasing social ostracism, and reducing psychiatric comorbidity. **There have been no randomized controlled trials of any treatment**. . . .

(Stewart L. Adelson, M.D., The American Academy of Child and Adolescent Psychiatry (AACAP) Committee on Quality Issues, *Practice Parameter on Gay, Lesbian, or Bisexual Sexual Orientation, Gender Nonconformity, and Gender Discordance in Children and Adolescents*, 51(9) J. Am. Acad. Child & Adolescent Psychiatry 957, 968 (2012) [hereinafter AACAP Statement], *available at* https://doi.org/10.1016/j.jaac.2012.07.004 (emphasis added) (footnote omitted).)[5]

Also:

> **Given the lack of empirical evidence** from randomized, controlled trials of the efficacy of treatment aimed at eliminating gender discordance, the potential risks of treatment, and longitudinal

---

[5] The AACAP Statement is cited in SB 1028 as follows: "The American Academy of Child and Adolescent Psychiatry published in 2012 an article in its journal entitled 'The Journal of the American Academy of Child and Adolescent Psychiatry . . . .'" (V. Compl. Ex. A, SB 1028, at 3.)

evidence that gender discordance persists in only a small minority of untreated cases arising in childhood, **further research is needed** on predictors of persistence and desistence of childhood gender discordance as well as the long-term risks and benefits of intervention . . . .

(*Id.* at 969 (emphasis added).)

As with the APA Report, the AACAP Statement leaves discretion with the licensed professional to make an informed decision, with the patient, about the most appropriate treatment. (AACAP Statement at 969 ("As an ethical guide to treatment, 'the clinician has an obligation to inform parents about the state of the empiric database' . . . ." (footnote omitted), 971 ("The ultimate judgment regarding the care of a particular patient must be made by the clinician in light of all of the circumstances presented by the patient and that patient's family, the diagnostic and treatment options available, and other available resources.").)

The APA itself more recently addressed issues of gender identity and minors which were not included in the APA Report. (Am. Psychol. Ass'n, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70(9) Am. Psychologist 832 (2015) [hereinafter APA TGNC Guidelines], https://www.apa.org/practice/guidelines/transgender.pdf.) As a discussion separate from SOCE, these later Guidelines make the point that "[t]he constructs of gender identity and sexual orientation are theoretically and clinically distinct, even though professionals and nonprofessionals frequently conflate them." (APA TGNC Guidelines at 835.) Nonetheless, the APA recognized the same absence of research on gender identity change in children: "Due to the evidence that not all children persist in a TGNC identity into adolescence or adulthood, and because **no approach to working with TGNC children has been adequately, empirically validated**, consensus does not exist regarding best practice with prepubertal children." (*Id.* at 842 (emphasis added).) One distinct approach recognized by the APA "to address gender identity concerns in children" is an approach where "children are encouraged to embrace

their given bodies and to align with their assigned gender roles." (*Id.*) And again, calling for more research, the APA concludes, "**It is hoped that future research** will offer improved guidance in this area of practice." (*Id.* (emphasis added) (citation omitted).)

Notwithstanding the APA's call for future research, however, the APA expressly sanctioned as **imperative** allowing a minor who has selected a gender identity different from his or her biological sex to choose to return:

> Emphasizing to parents the importance of allowing their child the freedom **to return to a gender identity that aligns with sex assigned at birth** or another gender identity at any point **cannot be overstated**, particularly given the research that suggests that not all young gender nonconforming children will ultimately express a gender identity different from that assigned at birth.

(APA TGNC Guidelines at 843 (emphasis added).)

Other literature by a research scientist favorably cited in the AACAP Statement positively advances treatment to assist children in fading "cross-gender identity" by the time they reach adolescence. (Heino F. L. Meyer-Bahlburg, *Gender Identity Disorder in Young Boys: A Parent- and Peer-Based Treatment Protocol*, 7 Clinical Psychol. and Psychiatry 360, 361 (2002) [hereinafter Meyer-Bahlburg] ("We expect that we can diminish these problems if we are able to speed up the fading of the cross-gender identity which will typically happen in any case.") (cited by AACAP Statement at 969 n.100); *see also* Meyer-Bahlburg at 365 ("The specific goals we have for the boy are to develop a positive relationship with the father (or a father figure), positive relationships with other boys, gender-typical skills and habits, to fit into the male peer group or at least into a part of it, and to feel good about being a boy.").)

4.   **The APA Report Commends a Client-Directed Approach to Therapy for Clients with Unwanted Same-Sex Attractions, Commends More Research on Voluntary SOCE, and Condemns Only Coercive Therapies.**

For adults desiring "**to change their sexual orientation** or their behavioral expression of their sexual orientation, or both," the APA reported that "adults perceive a benefit when they are provided with **client-centered** . . . approaches" involving "identity exploration and development," "**respect for the client's values, beliefs, and needs**," and "permission and opportunity to explore a wide range of options . . . **without prioritizing a particular outcome**." (V. Compl. Ex. A, APA Rep., at 4.) The task force elaborated:

> Given that there is diversity in how individuals define and express their sexual orientation identity, an affirmative approach is supportive of clients' identity development without an a priori treatment goal concerning how clients identify or live out their sexual orientation or spiritual beliefs. This type of therapy . . . can be helpful to those who accept, reject, or are ambivalent about their same-sex attractions. The treatment does not differ, although the outcome of the client's pathway to a sexual orientation identity does.

(V. Compl. Ex. A, APA Rep., at 5 (emphasis added).) "For instance, the existing research indicates that possible outcomes of sexual orientation identity exploration **for those distressed by their sexual orientation** may be: LGB identities[,] **Heterosexual sexual orientation identity**[,] Disidentifying from LGB identities[, or] Not specifying an identity." (*Id.* at 60 (emphasis added) (citations omitted).)[6]

_____

[6]   In connection with its SOCE review and recommendations, the APA Report highlighted a problem with the sexual orientation terminology in the academic research:

> Recent studies of participants who have sought SOCE **do not adequately distinguish between sexual orientation and sexual orientation identity**. We concluded that the failure to distinguish these aspects of human sexuality has led SOCE research to obscure

A key finding from the task force's review "is that those *who participate in SOCE,* ***regardless of the intentions of these treatments****, and those who resolve their distress through other means,* ***may evolve during the course of their treatment in such areas as self-awareness, self-concept, and identity***." (V. Compl. Ex. A, APA Rep., at 66 (bold emphasis added); *id.* at 61 ("Given . . . that many scholars have found that **both religious identity and sexual orientation identity evolve**, it is important for LMHP to explore the development of religious identity and sexual orientation identity." (emphasis added) (citations omitted)).)

The task force identifies the **same essential framework "for children and adolescents** who present a desire to change either their sexual orientation or the behavioral expression of their sexual orientation, or both, or whose parent or guardian expresses a desire for the minor to change."[7] (V. Compl. Ex. A, APA Rep., at 5 (emphasis added).) Specifically, for children and youth, "[s]ervices . . . should support and respect age-appropriate issues of **self-determination**; services should also be provided in the least restrictive setting that is clinically possible and should maximize self-determination. At a minimum, **the assent of the youth should be obtained,**

---

what actually can or cannot change in human sexuality. . . . **[S]ome individuals modified their sexual orientation identity** (e.g., individual or group membership and affiliation, self-labeling) **and other aspects of sexuality** (e.g., values and behavior). . . . **[I]ndividuals, through participating in SOCE, became skilled in ignoring or tolerating their same-sex attractions. Some individuals reported that they went on to lead outwardly heterosexual lives, developing a sexual relationship with an other-sex partner, and adopting a heterosexual identity**.

(V. Compl. Ex. A, APA Rep., at 3–4 (emphasis added).)

[7]    The APA Report defines "*adolescents* as individuals between the ages of 12 and 18 and children as individuals under age 12." (V. Compl. Ex. B, APA Rep., at 71 n.58.)

**including whenever possible a developmentally appropriate informed consent to treatment**.” (*Id.* (emphasis added).)

The task force also highlighted the ethical importance of client self-determination, encompassing “the ability to seek treatment, consent to treatment, and refuse treatment. **The informed consent process is one of the ways by which self-determination is maximized in psychotherapy**.” (V. Compl. Ex. A, APA Rep., at 68 (emphasis added); *see also id.* at 6 (“LMHP **maximize self-determination** by . . . providing effective psychotherapy that explores the client’s assumptions and goals, without preconditions on the outcome [and] **permitting the client to decide the ultimate goal of how to self-identify and live out her or his sexual orientation**. . . . [T]herapy that increases the client’s ability to cope, understand, acknowledge, and integrate sexual orientation concerns into **a self-chosen life** is the measured approach.”).)

The task force viewed the concept of self-determination as equally important for minors: “It is now recognized that **adolescents are cognitively able to participate in some health care treatment decisions**, and such participation is helpful. [The APA] encourage[s] professionals to seek the assent of minor clients for treatment.” (V. Compl. Ex. A, APA Rep., at 74 (emphasis added) (citations omitted); *see also id.* at 77 (“The ethical issues outlined [for adults] are also relevant to children and adolescents . . . .”).)

In light of this strong self-determination ethic regarding youth, the task force “recommend[ed] that when it comes to treatment that purports to have an impact on sexual orientation, LMHP assess the adolescent’s ability to understand treatment options, provide developmentally appropriate informed consent to treatment, and, at a minimum, obtain the youth’s assent to treatment.” (*Id.* at 79.) “[F]or children and adolescents who present a desire to change their sexual orientation or their behavioral expression of their sexual orientation, or both, or whose

guardian expresses a desire for the minor to change," the task force recommended "approaches [that] support children and youth in identity exploration and development without seeking predetermined outcomes." (*Id.* at 79–80.) "LMHP should strive to maximize autonomous decision making and self-determination and avoid coercive and involuntary treatments."[8] (*Id.* at 76.) "The use of inpatient and residential treatments for SOCE is inconsistent with the recommendations of the field." (*Id.* at 74–75.)

Apart from recommending against coercive, involuntary, and residential treatments, the task force **did not recommend the end of SOCE**. Rather, without empirical evidence of SOCE efficacy or harm, the task force merely recommended that clients not be lead to **expect** a change in sexual orientation through SOCE. (V. Compl. Ex. A, APA Rep., at 66.) Indeed, the task force cited literature expressly **cautioning against declining SOCE** therapy for a client who requests it.

> LMHP who turn down a client's request for SOCE at the onset of treatment without exploring and understanding the many reasons why the client may wish to change may instill hopelessness in the client, who already may feel at a loss about viable options. . . . **[B]efore coming to a conclusion regarding treatment goals, LMHP should seek to validate the client's wish to reduce suffering and normalize the conflicts at the root of distress**, as well as create a therapeutic alliance that recognizes the issues important to the client.

(V. Compl. Ex. A, APA Rep., at 56 (emphasis added) (citation omitted).)

---

[8] The APA Report defines "*coercive treatments* as practices that compel or manipulate a child or adolescent to submit to treatment through the use of threats, intimidation, trickery, or some other form of pressure or force." (V. Compl. Ex. B, APA Rep., at 71 n.59.) It defines "*involuntary treatment* as that which is performed without the individual's consent or assent and which may be contrary to his or her expressed wishes." (*Id.* at 71 n.60.)

The task force also called for more research on SOCE. (V. Compl. Ex. A, APA Rep., at 91 ("Any future research should conform to best-practice standards for the design of efficacy research. Additionally, **research into harm and safety is essential**."), 91 ("**Future research** will have to better account for the motivations and beliefs of participants in SOCE."), 91 ("**This line of research should be continued and expanded to include conservatively religious youth and their families**.") (all emphases added).)

The task force also noted, "The debate surrounding SOCE has become mired in ideological disputes and competing political agendas." (V. Compl. Ex. A, APA Rep., at 92 (citation omitted).) One policy recommendation "urges the APA to: . . . Encourage advocacy groups, **elected officials**, policymakers, religious leaders, and other organizations to **seek accurate information and avoid promulgating inaccurate information**." (*Id.* (emphasis added).) The task force's call for future research implicitly rejected the suggestion by some that "SOCE should not be investigated or practiced until safety issues have been resolved." (*Id.* at 91.)

Given the absence of empirical evidence on SOCE outcomes, and the emphasis on client-centered approaches, the task force recommended that choosing SOCE counseling be given to the discretion of licensed mental health providers (LMHP):

> [The APA Ethics Code] establishes that psychologists aspire to provide services that maximize benefit and minimize harm. . . . When applying this principle in the context of providing interventions, **LMHP assess the risk of harm, weigh that risk with the potential benefits, and communicate this to clients through informed consent procedures** that aspire to provide the client with an understanding of potential risks and benefits that are accurate and unbiased. . . .
>
> In weighing the harm and benefit of SOCE, LMHP can review with clients the evidence presented in this report. Research on harm from SOCE is limited, and some of the research that exists suffers from methodological limitations that make broad and definitive conclusions difficult. . . .

(V. Compl. Ex. A, APA Rep., at 67 (emphasis added) (citations omitted); *see also id.* at 6 ("LMHP reduce potential harm and increase potential benefits by basing their scientific and professional judgments and actions on the most current and valid scientific evidence, such as the evidence provided in this report.").)

> ### 5. The APA Report Specifically Calls for Therapists to Respect and Consider the Religious Values of Individuals Desiring Therapy.

The APA task force highlighted the particular stress experienced by individuals of conservative religious faiths who "struggle to live life congruently with their religious beliefs," and that this stress "had mental health consequences." (V. Compl. Ex. A, APA Rep., at 46–47.) "Some conservatively religious individuals felt a need to change their sexual orientation because of the positive benefits that some individuals found from religion . . . ." (*Id.* at 47.) Thus, the task force "proposed an approach that respects religious values and welcomes all of the client's actual and potential identities by exploring conflicts and identities without preconceived outcomes. This approach does not prioritize one identity over another and may aide a client in creating a sexual orientation identity consistent with religious values." (V. Compl. Ex. A, APA Rep., at 67 (citation omitted).) "Although there are tensions between religious and scientific perspectives, the task force and other scholars do not view these perspectives as mutually exclusive." (V. Compl. Ex. A, APA Rep., at 67 (citations omitted).)

## ARGUMENT

In the Fourth Circuit, Plaintiff can obtain a preliminary injunction if he establishes "'[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.'" *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 188 (4th

Cir. 2013) (quoting *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 20 (2008)).

Plaintiff satisfies these criteria and an injunction should issue.

**I.**     **PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF HIS FIRST AMENDMENT CHALLENGE TO SB 1028.**

    **A.**     **Though Plaintiff Must Show the Preliminary Injunction Prerequisites, Defendants Have the Burden of Proving the Constitutionality of SB 1028 Under the First Amendment.**

Defendants face a much higher burden to prove the Constitutionality of SB 1028 under the applicable constitutional standards. (*See infra* Part I.D.2.) Defendants bear the burden of demonstrating that SB 1028 satisfies strict scrutiny. As the Supreme Court held, "the burdens at the preliminary injunction stage track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006). Thus, on a preliminary injunction motion, **the government**—not the movant—bears the burden of proof on narrow tailoring, because **the government** bears that burden at trial. *Ashcroft v. ACLU*, 542 U.S. 656, 665 (2004) (holding, on preliminary injunction motion, "**the burden is on the government** to prove that the proposed alternatives will not be as effective as the challenged statute." (emphasis added)). Defendants indisputably bear the burden of proving narrow tailoring at trial. *See, e.g.*, *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions."); *id.* at 2540 ("To meet the requirement of narrow tailoring, **the government must demonstrate** that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier" (emphasis added)). Plaintiff "**must be deemed likely to prevail unless the government has shown** that . . . proposed less restrictive alternatives are less effective than enforcing the act." *Ashcroft*, 542 U.S. at 666 (emphasis added). Accordingly,

Defendants bear—and cannot carry (*see infra* Parts I.D.2, 4)—the burden of proving narrow tailoring here. *See Gonzales*, 546 U.S. at 429; *Ashcroft*, 542 U.S. at 665.

**B.    SB 1028 Restricts Plaintiff's Protected Speech.**

The apparent rationale for SB 1028, as for similar statutes across the country, is that it is a permissible regulation of "professional conduct" that is subject to only rational basis review. According to recent Supreme Court pronouncements, however, that argument is fatally flawed in two respects: The SOCE counseling prohibited by SB 1028 is speech, not conduct, and there is no separate category of "professional speech" for which the Court has relaxed rigorous strict scrutiny review. *See Nat'l Inst. for Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371–72 (2018) [hereinafter *NIFLA*] ("[T]his Court has not recognized 'professional speech' as a separate category of speech. Speech is not unprotected merely because it is uttered by professionals."); *see also Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2229 (2015); *Holder v. Humanitarian Law Project,* 561 U.S. 1, 27 (2010) ("The Government is wrong that the only thing actually at issue in this litigation is conduct . . . . [The statute] regulates speech on the basis of its content."); *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533 (2001) (holding federal act providing litigation funding to private attorneys unconstitutionally restricted attorneys' speech by prohibiting recipients' giving legal advice on certain subjects); *NAACP v. Button*, 371 U.S. 415, 438 (1963) ("[A] state may not, under the guise of prohibiting professional misconduct, ignore constitutional rights.").

Indeed, as the *NIFLA* Court reiterated barely seven months ago, sanctioning the government's cunning labelling of a professional's speech as "conduct" would eviscerate the First Amendment protections guaranteed to doctors, lawyers, nurses, mental health professionals, and many others:

> All that is required to make something a profession . . . is that it involves personalized services and requires a professional license from the State. But that gives the States unfettered power to reduce

a group's First Amendment rights by simply imposing a licensing requirement**. States cannot choose the protection that speech receives under the First Amendment**, as that would give them a powerful tool to impose invidious discrimination on disfavored subjects.

*NIFLA*, 138 S. Ct. at 2372 (emphasis added).[9]

**C.** **SB 1028 Unconstitutionally Discriminates Against Plaintiff's Protected Speech on the Basis of Viewpoint.**

A viewpoint-based restriction on private speech has never been upheld by the Supreme Court, or any court. Indeed, a finding of viewpoint discrimination is dispositive. *See Sorrell v. IMS Health*, 564 U.S. 552, 571 (2011). "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Id.* at 829. In fact, **viewpoint-based regulations are always unconstitutional**. *See, e.g., Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993) ("'[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others.'"); *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985) ("[T]he government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses . . . ."); *see also Columbia Union Coll. v.*

---

[9]     The recent en banc Eleventh Circuit decision in *Wollschlaeger v. Florida* also supports the conclusion that SB 1028 bans protected speech. There, the entire Eleventh Circuit recognized that "**characterizing speech as conduct is a dubious constitutional enterprise**." 848 F.3d 1293, 1309 (11th Cir. 2017) (en banc) (emphasis added). In the same breath, the court presciently observed, "There are serious doubts about whether *Pickup [v. Brown]* was correctly decided." *Id.*; *cf. NIFLA*, 138 S. Ct. at 2371–72 (abrogating by name counseling ban decisions in *Pickup v. Brown*, 740 F.3d 1208, 1227–1229 (9th Cir. 2014), and *King v. Governor of New Jersey,* 767 F.3d 216, 232 (3d Cir. 2014)) ("This Court's precedents do not recognize such a tradition for a category called 'professional speech.'").

*Clarke,* 159 F.3d 151, 156 (4th Cir. 1998) (holding Maryland infringed on private religious college's free speech rights by establishing program to provide financial support for private colleges but denying funding to religious college solely based on religious viewpoint).

SB 1028 exemplifies viewpoint discrimination. On its face, SB 1028 defines its byword "conversion therapy" to prohibit talk therapy that helps a client "eliminate or reduce sexual or romantic attractions or feelings **toward individuals of the same gender**." (V. Compl., Ex. A, SB 1028, at 5 (emphasis added).) So defined, it prohibits the particular viewpoint that unwanted same-sex attraction can be reduced or eliminated to the benefit of a client who wants such counseling, for the counselor's even saying so would be caught up in the broad "practice or treatment" and "any effort to change" language of the counseling ban. Conversely, the plain language of SB 1028 permits any viewpoint communicating "acceptance, support, and understanding, or . . . facilitation" towards new or increasing same-sex or cross-gender attractions for the same client who wants to reduce or eliminate them. (*Id.*)

Thus, SB 1028 prohibits counseling that affirms a minor client's desire to change his developing sexual orientation or related attractions, feelings, behaviors, or identity to conform to his own concept of self and biological identity, but allows counseling on the same subject matter that affirms or commends the development of a changing sexual orientation. Thus also, SB 1028 prohibits counseling that affirms a minor's seeking to eliminate gender identity conflict or, having already transitioned to a cross-gender identity, to de-transition and conform his gender identity to his own concept of self and biological identity, while allowing counseling that affirms and commends a minor's transitioning from his or her biological gender identity to a cross-gender identity. There can be no question that SB 1028 discriminates against the viewpoint disfavored by Maryland.

The Supreme Court and several other courts have invalidated regulations of professional speech as unconstitutional viewpoint discrimination. *See, e.g.*, *NIFLA*, 138 S. Ct. at 2371–72; *Sorrell*, 564 U.S. at 580; *Velazquez*, 531 U.S. at 548–49; *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002). In these cases, the courts recognized the axiomatic truth that the government is not permitted to impose its viewpoint on speakers, even if they are professionals subject to licensing requirements and other regulations.

In *Velazquez,* the Supreme Court addressed a restrictive federal funding law that operated in the same viewpoint-based manner as SB 1028. The law provided grant funding to private legal aid attorneys who accepted certain welfare cases, but prohibited grant funding to attorneys if they challenged welfare laws on behalf of their clients. *Velazquez*, 531 U.S. at 536–39. The Court invalidated the law as viewpoint discriminatory, because it had the effect of prohibiting "advice or argumentation that existing welfare laws are unconstitutional or unlawful," and thereby excluded certain "vital theories and ideas" from the lawyers' representation. *Id.* at 547–49.

In *Conant*, the Ninth Circuit invalidated a federal policy that punished physicians for communicating with their patients about the benefits or options of marijuana as a potential treatment. 309 F.3d at 633. The court explained that the doctor-patient relationship is entitled to robust First Amendment protection:

> An integral component of the practice of medicine is the communication between a doctor and a patient. **Physicians must be able to speak frankly and openly to patients**. That need has been recognized by courts through the application of the common law doctor-patient privilege.

*Id.* at 636 (emphasis added). The court also observed that, far from being a First Amendment orphan, such professional speech "'may be entitled to the strongest protection our Constitution has to offer.'" *Id.* at 637 (quoting *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 634 (1995)). The court held that the ban impermissibly regulated physician speech based on viewpoint:

The government's policy in this case seeks to punish physicians on the basis of the content of doctor-patient communications. Only doctor-patient conversations that include discussions of the medical use of marijuana trigger the policy. Moreover, **the policy does not merely prohibit the discussion of marijuana; it condemns expression of a particular viewpoint, i.e., that medical marijuana would likely help a specific patient**. Such condemnation of particular views is especially troubling in the First Amendment context.

*Id.* at 637–38 (emphasis added). The court rejected as inadequate the government's justification that the policy prevented clients from engaging in harmful behavior, and permanently enjoined enforcement of the policy. *Id.* at 638–39.

SB 1028 here operates almost identically to the federal policy enjoined in *Conant.* Just as the policy in *Conant* prohibited physicians from speaking about the benefits of marijuana to a suffering patient, so does SB 1028 prohibit counselors from speaking about the potential for beneficial counseling to aid a client in reducing or eliminating unwanted sexual or gender identity conflicts. In both cases, the law expresses a preference for the message the government approves, and disdain—with attached punishment—for the viewpoint the government abhors. As was true of the law in *Conant,* SB 1028 here should be invalidated as unconstitutional viewpoint discrimination.

> **D.    SB 1028 Unconstitutionally Discriminates Against Plaintiff's Protected Speech on the Basis of Content.**
>
> **1.    SB 1028 Is a Content-Based Restriction on Speech Which is Presumptively Invalid and Subject to Strict Scrutiny.**

"Content-based laws—those that target speech on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling government interests." *Reed*, 135 S. Ct. at 2226; *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992) ("[T]he danger of censorship presented by a

facially content-based statute requires that that weapon be employed only where it is '*necessary* to serve the asserted [compelling] interest.'" (alteration in original) (citations omitted)). Put simply, the Supreme Court has handed down a firm rule: laws that are content based on their face must satisfy strict scrutiny.

Importantly, this firm rule mandating strict scrutiny of facially content-based restrictions applies regardless of the government's alleged purpose in enacting the law. *Reed*, 135 S. Ct. at 2227 ("On its face, the [law] is a content-based regulation of speech. We thus have no need to consider the government's justifications or purposes for enacting the [law] to determine whether it is subject to strict scrutiny."). In so holding, the Court rejected the lower court's rationale that the alleged purpose behind enacting a content-based law can justify subjecting it to diminished constitutional protection. *Id.* "[T]his analysis skips the crucial first step . . . determining whether the law is content neutral on its face." *Id.* at 2228. The answer to that question, the *Reed* Court said, is dispositive of the level of scrutiny applicable to the regulation of speech. *Id.* "**A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech.**" *Id.* (emphasis added). "[A]n innocuous justification cannot transform a facially content-based law into one that is content neutral." *Id.*

As *NIFLA* made clear, this rule also applies to content-based restrictions on the speech of licensed professionals. *NIFLA*, 138 S. Ct. at 2371-72. "[T]his Court has not recognized 'professional speech' as a separate category of speech. Speech is not unprotected merely because it is uttered by professionals." *Id.* As the Court said in *Reed*:

> Although Button predated our more recent formulations of strict scrutiny, the Court rightly rejected the State's claim that its interest in the regulation of professional conduct rendered the statute consistent with the First Amendment, observing that **it is no answer**

> **to say that the purpose of these regulations was merely to insure high professional standards and not to curtail free expression.**

135 S. Ct. at 2229 (citing *Button*, 371 U.S. at 438–39) (emphasis added).

Thus, content-based laws must satisfy strict scrutiny, even if targeted at licensed professionals. *Reed,* 135 S. Ct. at 2229. There are no exceptions to this rule.[10] Indeed, the notion that a content-based restriction on speech is presumptively unconstitutional is "so engrained in our First Amendment jurisprudence that last term we found it so 'obvious' as to not require explanation." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd*., 502 U.S. 105, 115-16 (1991). The burden is on Defendants to prove that SB 1028's content-based and presumptively invalid restrictions can satisfy strict scrutiny, and Defendants cannot meet that burden.

### 2. Defendants Have the Burden of Proof on Strict Scrutiny.

#### a. Defendants Must Show Empirical or Concrete Evidence of Harm.

As shown in Part I.A, *supra*, Defendants have the burden of proving the constitutionality of SB 1028 under the strict scrutiny standard. And in this First Amendment context, the government is not entitled to deference in making speech-restrictive determinations. When "[a] speech-restrictive law with widespread impact" is at issue, "**the government must shoulder a correspondingly heavier burden and is entitled to considerably less deference in its assessment that a predicted harm justifies a particular impingement on First Amendment**

---

[10] The concurring Justices remove any doubt of the concrete nature of the rule. *See, e.g., Reed*, 135 S. Ct. at 2233 (Alito, J., concurring) ("As the Court holds, what we have termed 'content-based' laws must satisfy strict scrutiny."); *id.* at 2234 (Breyer, J., concurring) (noting under majority's rule finding of content discrimination is **"an automatic strict scrutiny trigger**." (emphasis added)); *id.* at 2236 (Kagan, J., concurring in the judgment) ("Says the majority, when laws single out specific subject matter, they are facially content based; and when they are facially content based, they are **automatically subject to strict scrutiny**." (emphasis added)).

**rights**." *Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2472 (2018) (emphasis added). Here, because SB 1028 infringes upon the free speech rights of licensed medical professionals, the government "must do more than simply posit the existence of the disease sought to be cured. It must demonstrate that the recited harms are real, not merely conjectural." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994); *see also Edenfield v. Fane*, 507 U.S. 761, 770 (1993) (recognizing government regulation of professional speech not supportable by "mere speculation or conjecture"); *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 841 (1978) ("The Commonwealth has offered little more than assertion and conjecture to support its claim . . . ."). This is so because "[d]eference to legislative findings cannot limit judicial inquiry when First Amendment rights are at stake." *Landmark Commc'ns*, 435 U.S. at 843.

Courts have not hesitated to invalidate laws that impose restrictions on speech based on supposition and conjecture, rather than empirical evidence. In *Edenfield*, where the government sought to restrict the speech of licensed accountants, the government "presented no studies" and relied upon a record that "contain[ed] nothing more than a series of conclusory statements that add little if anything" to the government's effort to regulate certain speech. 507 U.S. at 771. Also, the government relied upon a report of an independent organization to bolster its claims of harm, but— exactly as the APA Report does in this case—the report there admitted that it was "unaware of the existence of **any empirical data supporting the theories**" of alleged harm. *Id.* at 772 (emphasis added). Because of the lack of evidence of harm, the Supreme Court invalidated the restriction as a violation of the accountants' First Amendment rights. In *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115 (1989), the Supreme Court again confronted a record (like here) where there was nothing more than anecdote and suspicion of harm behind a total prohibition on the targeted speech. 492 U.S. at 129. There was no record evidence "aside from conclusory statements during

the debates by proponents of the bill" and the record "contain[ed] no evidence" concerning the alleged effectiveness of other alternatives. *Id.* Because of that failure, the Supreme Court invalidated the ban. *Id.*[11]

> **b.** **Defendants Must Show That SB 1028 Was the Least Restrictive Means Available at the Time of Enactment.**

Under strict scrutiny, Defendants must also demonstrate that SB 1028 is the least restrictive means of advancing Maryland's claimed governmental interests. *See Boos v. Berry*, 485 U.S. 312, 329 (1988) (explaining when content-based restrictions on speech are analyzed under strict scrutiny, a law "is not narrowly tailored [where] a less restrictive alternative is readily available"); *Ward v. Rock Against Racism*, 491 U.S. 781, 798 n.6 (1989) (noting under "the most exacting scrutiny" applicable to content-based restrictions on speech, government must employ least restrictive alternative to pass narrow tailoring). Plaintiff "must be deemed likely to prevail unless the government has shown that . . . proposed less restrictive alternatives are less effective than enforcing the act." *Ashcroft*, 542 U.S. at 666.

To satisfy the narrow tailoring prong of their strict scrutiny burden, Defendants must show that Maryland "**seriously** undertook to address the problem with less intrusive tools readily available to it." *McCullen v. Coakley*, 134 S. Ct. 2518, 2539 (2014) (emphasis added). "To meet

---

[11]    The Eleventh Circuit, too, has invalidated laws regulating professional speech when the alleged harm purportedly being addressed was unsupported by concrete evidence. In *Mason v. Florida Bar*, 208 F.3d 952 (11th Cir. 2000), the government attempted to regulate the speech of attorneys, but "**presented no studies, nor empirical evidence of any sort** to suggest" that the harm they were positing was real, rather than merely conjectural. 208 F.3d at 957 (emphasis added). The Eleventh Circuit held that, to survive scrutiny, the government "has the burden . . . of producing **concrete evidence**" of the alleged harm prior to restricting the protected speech of licensed professionals. *Id.* at 958 (emphasis added). Indeed, it held that when there are "**glaring omissions in the record of identifiable harm**," the government has not satisfied "its burden to identify a genuine threat of danger." *Id.* (emphasis added).

the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *Id.* at 2540. Thus, Defendants "would have to show either that **substantially less-restrictive alternatives were tried and failed**, or that the **alternatives were closely examined and ruled out for good reason**." *Bruni v. City of Pittsburgh*, 824 F.3d 353, 370 (3d Cir. 2016) (emphasis added); *see also Reynolds v. Middleton*, 779 F.3d 222, 231 (4th Cir. 2015) ("As the Court explained in *McCullen* . . . the burden of proving narrow tailoring requires the [government] to *prove* that it actually *tried* other methods to address the problem.").

### 3. There Is No Compelling or Other Sufficient Governmental Interest for SB 1028's Ban on Voluntary Talk Therapy.

Defendants cannot meet their burden of showing the strict scrutiny requirement of a compelling interest supporting SB 1028. The Preamble merely recites, "Maryland has a compelling interest in protecting the physical and psychological well–being of minors, including LGBT youth, and in protecting minors against exposure to serious harm caused by sexual orientation change efforts . . . ." (V. Compl. Ex. A, SB 1023, at 4.) This bald assertion of "serious harm" not only misrepresents the Sources in the preceding recitals, but also is insufficient as a matter of law to establish a compelling interest. As shown in Part B of the Statement of Facts, *supra*, Defendants cannot point to any empirical or concrete evidence of harm to justify SB 1028.

The *Wollschlaeger* court taught that laws targeting the content of certain doctor-patient or counselor-client communications cannot be justified by the "paternalistic assertion that the policy was valid because patients might otherwise make bad decisions" if left to determine the best course of counseling for themselves. 848 F.3d at 1310. Maryland "does not have carte blanche to restrict the speech of doctors and medical professionals on a certain subject without satisfying the demands [of the First Amendment]." *Id.* at 1314. Indeed, just because Maryland "may generally believe

that doctors and medical professionals should not ask about, nor express views hostile to, [a certain position], it 'may not burden the speech of others in order to tilt the public debate in a preferred direction.'" *Id.* at 1313–14 (quoting *Sorrell*, 564 U.S. at 578–79). Where, as here, "[t]he record demonstrates that some patients do not object to questions and advice about [the prohibited content of speech], and some even express gratitude for their doctor's discussion of the topic," a law is unconstitutional if it "does not provide for such patients a means by which they can hear from their doctors on the topic." *Id.* at 1313. There are no such means provided in SB 1028 for clients who voluntarily seek Plaintiff's counseling on sexual and gender identity conflicts.

Furthermore, SB 1028 undermines several specific admonitions from the APA Report and related Sources, such as the APA imperative that minors be allowed to return to their biological gender, even after identifying as the other gender for a period of time. (*See supra* Stmt. Facts Part B.3.) SB 1028 also, for example, requires therapists such as Plaintiff to cut off counseling with clients who express a desire to alleviate their conflicted sexual or gender identities, which directly contradicts the APA Report's admonition to explore a client's identity issues instead of declining them outright, and Maryland's compulsory ethical regulation not to abandon or neglect clients. (*See supra* Stmt. Facts Part B.4; Md. Code Regs. 10.58.03.05.A(2)(a) ("A counselor may not . . . Abandon or neglect clients in counseling . . . .") Thus, SB 1028 prohibits counselors from assisting minors with change decisions even the APA expressly endorses, and otherwise creates harm identified by the APA and pre-existing Maryland law rather than reducing any.

### 4. SB 1028 Is Not the Least Restrictive Means or Otherwise Narrowly Tailored.

Defendants also cannot meet their strict scrutiny burden of showing that SB 1028 is the least restrictive means for advancing Maryland's purported interests or that the statute is otherwise narrowly tailored. Even if Defendants could conjure a compelling interest for SB 1028's ban on

voluntary SOCE counseling, Defendants could not meet their burden of showing that the statute is narrowly tailored. "It is not enough to show that the Government's ends are compelling; the means must be carefully tailored to achieve those ends." *Sable Commc'ns*, 492 U.S. at 126. There must be a 'fit between the . . . ends and the means chosen to accomplish those ends.'" *Wollschlaege*r, 848 F.3d at 1312 (quoting *Sorrell*, 564 U.S. at 572).

SB 1028 woefully fails narrow tailoring. It is not necessary to prevent harm (none has been established), and existing Maryland laws and regulations already prohibit practices that actually harm clients. (V. Compl. ¶¶ 53–76.) These pre-existing, comprehensive provisions already protect minors, and carry legal sanctions for violators, without suppressing speech. Under *R.A.V.*, if Maryland had content-neutral means of preventing the alleged harm, failing to employ those means demonstrates that SB 1028 is not narrowly tailored as a matter of law. *R.A.V.*, 505 U.S. at 395.

Moreover, if Maryland is concerned with possible harms to minors from being subjected to counseling involuntarily or coercively, Maryland could have banned those practices without indiscriminately outlawing voluntary SOCE counseling for willing clients. State-dictated informed consent requirements would be another less restrictive means to advance Maryland's purported interests. To be sure, when legislation virtually identical to SB 1028 was being debated in California, several mental health organizations recognized that such "legislation is attempting to undertake an unprecedented restriction on psychotherapy." (V. Compl. ¶ 152 & Ex. E at 1.) They proposed informed consent language that would have been much more narrowly tailored than SB 1028's unprecedented intrusion into the relationship between counselor and willing client. (*Id.*).

Furthermore, if the purpose of SB 1028 is to protect minors from the purported harms of SOCE counseling, it is "'wildly underinclusive,'" further undermining any notion of narrow

tailoring. *See NIFLA*, 138 S. Ct. at 2376 (quoting *Brown v. Entertainment Merchants Assn.*, 564 U.S. 786, 802 (2011)). The ban regulates only licensed professionals, necessarily excluding "conversion therapy" offered by unlicensed religious counselors and clergy. If Maryland genuinely believes all "conversion therapy" is harmful to minors, then exempting unlicensed religious counselors and clergy from regulation makes no sense. Maryland has the authority and police power to regulate conduct by adults that is considered harmful to children, whether or not those adults are religious or part of a religious institution. Moreover, in particular situations where the expertise and training of a licensed counselor can help ease a minor's distress over sexual or gender identity conflicts, forcing the minor to seek help from only unlicensed counselors may cause more harm than it avoids.[12] (Doyle Decl. ¶ 24.)

The APA Report is especially relevant here because, not only does it fail to present empirical evidence of harm from **any** kind of SOCE counseling, its non-empirical, anecdotal reporting of harm does not differentiate between SOCE from licensed professionals and SOCE from religious organizations or persons. (*See supra* Stmt. Facts Part B.1.) Thus, Maryland cannot justify the underinclusivity of SB 1028 on any claimed difference in harm between licensed SOCE and unlicensed religious SOCE, still further undermining any notion of narrow tailoring.

**E.      SB 1028 Is an Unconstitutional Prior Restraint.**

Prior restraints against constitutionally protected expression are highly suspect and disfavored. *See Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992). In fact, "any system of prior restraints comes to this Court bearing the heavy presumption against its constitutional validity." *Bantham Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963).

---

[12]      Plaintiff does not concede or posit that SB 1028 would be constitutional if it included unlicensed religious counselors or clergy in its prohibitions, or imply that religious counselors or clergy cause harm to minors when appropriately consulted on matters within their competencies.

Total prohibitions constitute prior restraints. *See 11126 Baltimore Blvd., Inc. v. Prince George's Cnty., Md.*, 58 F.3d 988, 994–95 (4th Cir. 1995) *abrogated on other grounds by City of Littleton v. Z.J. Gifts D-4, L.L.C.*, 541 U.S. 774 (2004) (distinguishing as prior restraint county ordinance prohibiting adult bookstores anywhere in county unless special exception obtained, from permissible ordinance restricting stores to only zoned locations). As was true of the total ban on adult bookstores in *11126 Baltimore Blvd.*, SB 1028 goes beyond merely regulating the time and place of counseling speech to totally banning a category of counseling speech with minors everywhere in the State, even if voluntarily sought. Moreover, there is no permit to be obtained excepting some counselors or some places from the ban. Such bans are subject to prior restraint analysis under *11126 Baltimore Blvd.,* and SB 1028 fails it.

**F.     SB 1028 Is Unconstitutionally Vague.**

A law is unconstitutionally vague and overbroad if it "either forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. Gen. Const. Co*., 269 U.S. 385, 391 (1926). Government policies "must be so clearly expressed that the ordinary person can intelligently choose, in advance, what course it is lawful for him to take." *Id*. at 393. "Precision of regulation" is the touchstone of the First Amendment. *Button,* 371 U.S. at 435. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined*." Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). While all regulations must be reasonably clear, "laws which threaten to inhibit the exercise of constitutionally protected" expression must satisfy "a more stringent vagueness test." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982). Such a law must give "adequate warning of what activities it proscribes" and must "set out explicit standards for those who apply it." *See Broadrick v. Oklahoma*, 413 U.S. 601, 607 (1973) (citing *Grayned,* 408 U.S. at 108).

SB 1028 does not fulfill either requirement and thus forces both mental health professionals and those enforcing the law to guess at its meaning and differ as to its application. Because sexual orientation and gender identity are fluid and changing concepts, licensed professionals are left to guess about what they are permitted to say to their clients who present with sexual or gender identity conflicts. (*See, e.g.*, V. Compl. Ex. B, APA Rep., at 2 (declaring "scientific fact" that "[s]ame-sex sexual attractions and behavior occur in the context of a variety of sexual orientations and sexual orientation identities, and **for some, sexual orientation identity (i.e., individual or group membership and affiliation, self-labeling) is fluid or has an indefinite outcome**." (emphasis added)).) SB 1028 leaves licensed counselors uncertain whether and at what point a particular recommendation or utterance to a minor client will cost them money or even their licenses. Similarly, enforcement officials cannot be certain at what point a counselor has crossed the line. This does not satisfy the stringent test required for the threat to Plaintiff's First Amendment rights. *See Vill. of Hoffman*, 455 U.S. at 499.

## II.     PLAINTIFF WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF PRELIMINARY RELIEF.

Given Plaintiff's likelihood of success on the merits of his constitutional challenges to SB 1028, as shown above, the irreparable harm prong of the preliminary injunction standard is satisfied as a matter of law: "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011); *Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003). Indeed, First Amendment violations are **presumed** to impose irreparable injury. *See, e.g.*, *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012); *see also* 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal*

*Practice & Procedure* §2948.1 (2d ed. 1995) ("When an alleged constitutional right is involved, most courts hold that **no further showing of irreparable injury is necessary**." (emphasis added)).

To be sure, Plaintiff and his clients are suffering and will continue to suffer immediate and irreparable injury absent injunctive relief. Plaintiff is being silenced in his ability to speak to his willing, minor clients with counseling to assist them in reducing or eliminating distress arising from unwanted sexual or gender identity conflicts, and his clients are likewise suffering irreparable injury from the denial of their right to hear such counseling. (V. Compl. ¶¶ 127–143.) If Plaintiff violates SB 1028's prohibitions he is subject to fines and other disciplinary action. If he follows SB 1028's requirements he will violate legal and ethical standards protecting client self-determination. The imposition of punishment for speech desired by clients and permitted by professional standards is a deprivation of constitutional rights and constitutes *a priori* irreparable harm.

## III.     THE BALANCE OF EQUITIES FAVORS PLAINTIFF.

A preliminary injunction will protect the very rights the Supreme Court has characterized as "lying at the foundation of a free government of free men." *Schneider v. New Jersey*, 308 U.S. 147, 151 (1939). As noted above, "even a temporary infringement of First Amendment rights constitutes a serious and substantial injury." *Legend Night Club*, 637 F.3d at 302; *Newsom,* 354 F.3d at 261. Conversely, Defendants are in no way harmed by issuance of a preliminary injunction against enforcing a statute which is not supported by evidence of harm to be prevented and is likely to be held unconstitutional. *See Newsom,* 354 F.3d at 261.

There can be no comparison between the irreparable loss of First Amendment freedoms suffered by Plaintiff and his clients absent injunctive relief, and Defendants' phantom interest in enforcing an unconstitutional law. The balance of the equities tips decidedly in Plaintiff's favor, and the preliminary injunction should issue.

## IV.    INJUNCTIVE RELIEF SERVES THE PUBLIC INTEREST.

The final prerequisite for preliminary relief is that it serve the public interest. *Newsom,* 354 F.3d at 261.The protection of First Amendment rights is of the highest public interest. *See Elrod*, 427 U.S. at 373. This protection is ipso facto in the interest of the general public because "First Amendment rights are not private rights . . . so much as they are rights of the general public. . . . 'for the benefit of all of us.'" *Machesky v. Bizzell*, 414 F.2d 283, 289 (5th Cir. 1969) (quoting *Time, Inc. v. Hill*, 385 U.S. 374, 389 (1967)). Indeed, "[i]njunctions protecting First Amendment freedoms are **always in the public interest,**" *ACLU of Ill. v. Alvarez,* 679 F.3d 583, 590 (7th Cir. 2012) (emphasis added); *Texans for Free Enter. v. Texas Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013).

## CONCLUSION

For all of the foregoing reasons, Plaintiff's Motion for Preliminary Injunction should be granted, and Defendants enjoined from enforcing SB 1028.

Respectfully submitted,

/s/ John R. Garza
John R. Garza (D. Md. 01921)
GARZA LAW FIRM, P.A.
Garza Building
17 W. Jefferson Street, Suite 100
Rockville, Maryland 20850
301-340-8200 ext. 100
301-761-4309 FAX
jgarza@garzanet.com

/s/ Roger K. Gannam
(signed by John R. Garza with permission of Roger K. Gannam)
Mathew D. Staver (Fla. 701092)[†]
Horatio G. Mihet (Fla. 26581)[†]
Roger K. Gannam (Fla. 240450)[†]
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854-0774
407-875-1776
407-875-0770 FAX
court@LC.org
hmihet@LC.org
rgannam@LC.org

*Attorneys for Plaintiffs*
[†]Application to appear *pro hac vice* forthcoming

35